JUDGE KAPLAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

WING F. CHAU and
HARDING ADVISORY LLC,

                            Plaintiffs,

           v.

SECURITIES AND EXCHANGE
COMMISSION,

                           Defendant.

------------------------------------------------------------X

14-cv-

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEVE AND DEMAND FOR JURY TRIAL**

Wing F. Chau and Harding Advisory LLC ("Harding") (collectively, "Plaintiffs"), for their complaint against the Securities and Exchange Commission ("SEC" or "Commission") allege as follows:

### Introduction

1.     Mr. Chau and Harding bring this action for declaratory and injunctive relief to prevent the Commission from violating their constitutional rights. The Commission ordered an administrative proceeding (the "AP") against Mr. Chau and Harding alleging violations of the securities laws in connection with their conduct as collateral manager of a number of collateralized debt obligation transactions ("CDOs"). In every other case like this one, the Commission afforded the defendant the various and significant procedural protections available in federal court by bringing its case in this Court. Not so here.

2.      Plaintiffs deny all allegations of wrongdoing and will do everything within their power to defend against each of the Commission's charges. Yet under the Commission's AP rules, the Plaintiffs would be denied the right to a jury trial, the use of the discovery procedures available in federal court to shape their defense, the ability to challenge claims before trial that fail to satisfy rational pleading standards and the protections of the Federal Rules of Evidence to bar unreliable evidence. These are substantial rights, and every other party who has been sued by the Commission in a case like this has been able to use those rights to narrow, if not completely eviscerate, the Commission's pleadings, theories and accusations. Plaintiffs are being deprived of those rights for no legitimate, rational reason.

3.      Plaintiffs, unlike the defendants in the other cases, face a proceeding where the rules prevent the administrative law judge from setting a reasonable trial schedule and issuing other appropriate rulings given the nature and complexity of the case. The case against Plaintiffs is highly complex, as illustrated by, among other things, the enormous size of the investigative file that the SEC's Division of Enforcement (the "Division") produced once the Commission issued an Order Instituting Proceedings ("OIP") against Plaintiffs.

4.      In response to requests from Plaintiffs, representatives of the Commission have repeatedly declined to provide any explanation as to why Plaintiffs are being singled out for disparate treatment, or to articulate a reason why it was proper to bring the case against Plaintiffs in the AP rather than in federal court. In the absence of an explanation, we are left with the Commission's apparent motives. All of them are improper.

5.      First, the Commission has repeatedly stumbled in this Court in the prior cases it has brought here and, indeed, has lost more of those cases than it has won.

6. A second, related motive concerns the application of the Commission's AP rules to the facts and circumstances of this case. The highly accelerated and inflexible hearing schedule required by the rules, combined with what can only be described as a colossal document dump by the Division means that Plaintiffs would be required to go to trial before being capable of unearthing exculpatory evidence and using it at trial. Although the Plaintiffs, to date, have had the ability to pull and review only approximately 1% of the investigative file that has been turned over by the Division, Plaintiffs have already found new evidence that flatly contradicts the Division's case. Given the pace of the AP and the rigid deadlines, exculpatory evidence will remain buried until after the trial in the AP has come and gone.

7. Third, the Division's investigation of Plaintiffs was tainted and the Commission has already taken other steps to foreclose inquiry into that misconduct and taint. By shoehorning the Plaintiffs into an AP where there are no depositions, no ability to make counterclaims and no meaningful motion practice, the Commission has continued to block Plaintiffs from developing a meaningful record of that wrongdoing.

8. In short, the Commission intentionally and strategically singled out the Plaintiffs by bringing this case as an AP and effectively tying the Plaintiffs' hands behind their backs. The best evidence that the Commission's case against Plaintiffs belongs in this Court is that the Commission has otherwise brought every one of the other, comparable cases here, in the Southern District of New York.

**Jurisdiction and Venue**

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1337, 1346, 1361 and 2201, and 5 U.S.C. §§ 702 and 706. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e).

## Parties

10. Mr. Chau is a natural person, residing in Miami-Dade County, Florida. Mr. Chau is the president and managing member of Harding.

11. Harding is a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business in Boca Raton, Florida.

12. The Commission is an agency of the United States government headquartered in Washington, D.C.

## The Commission's Forum Choice and the Rules of Practice

13. Whether the SEC brings an enforcement case administratively or in federal district court, the SEC can seek penalties and disgorgement, as well as other equitable relief, such as securities industry bars or orders prohibiting future violations of the federal securities laws.

14. There are no statutory standards that guide the SEC's choice of forum.

15. The Commission has publicly stated its intention to use administrative proceedings more frequently and in a wider variety of more complex cases, including cases that were historically brought in federal district court, but it has not changed its procedural rules for administrative actions.

16. In 2003, the SEC adopted amendments to its Rules of Practice in response to the perceived need to expedite administrative proceedings. The Commission adopted amendments to Rule 360, which replaced the then-existing non-binding goals for the completion of each step of the administrative process, and imposed mandatory deadlines and procedures to meet those deadlines. Rules of Practice, 68 Fed. Reg. 35,787 (June 17, 2003).

17. Pursuant to those 2003 amendments, Rule 360 now divides cases into three categories of complexity, requiring that an administrative law judge ("ALJ") issue an initial decision within 120, 210 or 300 days from service of the OIP. Each of those three categories is further divided into deadlines for holding a hearing, submitting post-hearing briefs, and issuing an initial decision. When the overall deadline is 300 days, Rule 360(a)(2) provides that there shall be approximately four months between service of the OIP and the hearing, approximately two months for the parties to obtain the transcript and submit briefs, and approximately four months after briefing for the ALJ to issue an initial decision. 17 C.F.R. § 201.360(a)(2).

18. No administrative proceeding—no matter how complex the subject matter or how voluminous the applicable documents—falls outside of the Rule 360(a)(2) deadlines. The Commission has applied the rules so as to ensure that no AP case can be tried later than approximately four months following the service of the OIP.

19. The OIP in this case relates to extremely complex transactions—investigated by the specialized unit created for the purpose of developing expertise in complex, structured-finance products, aptly named the "Complex Financial Instruments Unit"—and the investigative file consists of some 11.65 terabytes of data, which translates into roughly 22 million documents.

20. In providing the investigative file to Plaintiffs—ostensibly for Plaintiffs to use in preparing for trial—the Division represented that it consisted of materials that, at minimum, "may have been meaningfully consulted" in connection with the investigation that led to the AP against Plaintiffs.

21. On January 22, 2014, the Division gave Plaintiffs a *Brady* letter, describing various statements of witnesses and copies of certain notes taken during the investigation. No documents were identified as *Brady* material; instead the Division took the position that its

*Brady* obligations with respect to the documents have been fulfilled by virtue of its production of the entire 22 million document investigative file.

23. By any rational standard, it is obvious that this case does not belong in an administrative forum. Plaintiffs' AP hearing is scheduled to commence on March 31, 2014, approximately four months after Plaintiffs were served with the OIP.

### The OIP's Allegations

23. On October 18, 2013, the Commission issued against the Plaintiffs its Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Sections 203(e), 203(f), and 203(k) of the Investment Advisers Act of 1940, and Section 9(b) of the Investment Company Act of 1940. By this OIP, the Commission commenced the AP against Plaintiffs before an ALJ of the Commission seeking, among other relief, civil penalties.

24. The gist of the OIP is that Plaintiffs committed fraud in connection with the creation and marketing of various CDOs, including most prominently a $1.5 billion CDO known as Octans I, for which Harding served as collateral manager.

25. The OIP alleges that Merrill Lynch & Co. ("Merrill") structured and marketed Octans I and that a hedge fund, Magnetar Capital LLC ("Magnetar"), bought the deal equity, also known as the "first loss position." (OIP ¶¶ 3, 18, 19, 22.)

26. The OIP further alleges that investors in Octans I were led to believe that Harding selected the collateral assets for the CDO, but that Magnetar had an undisclosed role in the collateral selection. (OIP ¶¶ 18, 28, 59.) The OIP alleges that Magnetar's interests were "not aligned" with the interests of the investors who bought Octans I and, as a result, the alleged failure to disclose Magnetar's involvement in asset selection violated the securities laws. (OIP

¶¶ 25, 70-73.) The OIP asserts that Plaintiffs were motivated by their desire to ingratiate themselves with Merrill and Magnetar for the purpose of doing additional CDO deals with them and thereby earning additional fees. (OIP ¶ 8.)

27. Separately, the OIP alleges that as part of their effort to curry favor with Merrill and Magnetar, Plaintiffs agreed to buy certain notes issued by another Merrill/Magnetar CDO, the Norma CDO I ("Norma"), despite having a "basically unfavorable" view of the notes. (OIP ¶¶ 60-69.) Plaintiffs are alleged to have placed the Norma notes in other CDOs that they managed to the purported detriment of investors in those CDOs. (OIP ¶¶ 66-68.)

28. Finally, the OIP alleges that Plaintiffs failed to meet the applicable standard of care in connection with Octans I and the two other CDOs into which Plaintiffs placed the Norma notes, Neo 2007-01 ("Neo") and Lexington Capital Funding V ("Lexington V"). (See OIP ¶¶ 6, 68.) The OIP alleges that the Plaintiffs independently violated the securities laws in connection with Neo and Lexington V, even though the Norma notes at issue constituted a mere 1.6% of each of those deals. The total combined deal value of the Neo and Lexington V CDOs was close to another $1 billion.

29. The Commission cannot prove that Plaintiffs made any material misrepresentations or fraudulent omissions, breached any obligations, or compromised their standards in connection with serving as collateral manager in Octans I, Neo or Lexington V.

### The Commission's Disparate and Unlawful Treatment of Plaintiffs

30. The Commission has brought three other contested cases related to the structuring and marketing of CDOs that are nearly identical in terms of scope, complexity, types of instruments, amounts of money at issue, categories of witnesses, length of investigation, violations alleged, legal theories involved, and penalties sought. Indeed, the hedge fund

Magnetar, whose involvement in Octans I and in the Norma purchases is at the very heart of the allegations in the OIP, also played a singularly prominent role in each of the other three CDO cases that were brought in this Court. The striking similarity among the three other cases and Plaintiffs' case is manifest. A chart illustrating those similarities is attached as Exhibit 1.

31.   Of the three previous cases, the Commission lost two of them and it only won the third by eliciting proof and by making affirmative arguments to the jury and to District Judge Forrest about industry practices for collateral managers, about the participation of Magnetar in the collateral selection process and about the relevant standards of care that are diametrically opposed to the positions the Commission is taking in the AP against Plaintiffs. The three previous cases that the SEC brought in federal court and that are virtually identical to the case against Plaintiffs are described below.

### *The Commission's Civil Enforcement Actions in this Courthouse*

32.   On July 31, 2012, a jury sitting in this Courthouse found a Citigroup employee, Brian Stoker, not liable for any of the securities laws violations that had been alleged by the Commission. *SEC v. Brian Stoker*, Civ. Action No. 11-cv-7388 (S.D.N.Y.). The Commission commenced that action by filing a complaint on October 19, 2011. The case against Stoker, similar to the case against Plaintiffs, related to his role in structuring and marketing a CDO. The allegations in the *Stoker* complaint were based on the alleged undisclosed "influence" that Citigroup, acting in part on its purported knowledge of hedge fund Magnetar's trading positions, exercised over the asset selection process being performed by an outside collateral manager. Of course, Magnetar is the same hedge fund that the Commission alleges exercised undisclosed "influence" over the Plaintiffs' asset selection process in Octans I and the other CDOs that are described in the OIP.

33.     The Commission brought another CDO case in 2011 in this district against a collateral manager, Edward Steffelin. *SEC v. Edward Steffelin*, Civ. Action No. 11-4204 (S.D.N.Y.). The complaint in that case, like the OIP against Plaintiffs, alleged that the collateral manager permitted undisclosed "involvement" by hedge fund Magnetar in the portfolio selection process for a CDO. On October 27, 2011, United States District Judge Miriam Cedarbaum dismissed the Commission's claim under section 17(a)(3) of the Securities Act of 1933. Slightly more than a year later, the Commission voluntarily dismissed the remainder of its claims against Mr. Steffelin; Judge Cedarbaum executed the parties' stipulation of dismissal with prejudice on November 16, 2012, almost 17 months after the complaint against Mr. Steffelin was filed.

34.     On August 1, 2013, a jury sitting in this Courthouse found a Goldman Sachs & Co. employee, Fabrice Tourre, liable on six civil claims that were pursued by the Commission. This result occurred in the context of a civil enforcement action, *SEC v. Goldman Sachs & Co. and Fabrice Tourre*, Civ. Action. No. 10-cv-03229 (S.D.N.Y.), that the Commission commenced by filing a complaint on April 16, 2010. The Commission's complaint related to the structuring and marketing of a CDO called ABACUS 2007-AC1 ("Abacus"). The complaint was based on purported statements and omissions concerning the undisclosed "significant role" that hedge fund Paulson & Co. ("Paulson") allegedly played in the portfolio selection process being performed by the collateral manager. The collateral manager in the Abacus deal, which was not charged with any wrongdoing, was ACA Management LLC ("ACA"). On August 1, 2013, a jury found Tourre, a registered representative at Goldman Sachs & Co., liable.

35.     The circumstances suggest that the Division wished to avoid this forum because it lost *Steffelin* and *Stoker*, and won *Tourre* as a direct result of successfully advancing a theory of liability that contradicts the position it now seeks to advance against Mr. Chau and Harding.

During the *Tourre* trial, the Division used ACA's conduct as collateral manager in a separate deal that involved Magnetar as an equity investor—a deal that, in all material respects, is virtually identical to Octans I, the deal at issue in the AP—to illustrate comportment with relevant standards of care. The Division drew a contrast between that deal and ACA's conduct in it, which the Division embraced, and the scenario in Abacus, where portfolio selection was alleged to have been influenced by a "purely short" investor that had made no equity investment. In short, the Division endorsed conduct by the collateral manager in *Tourre* that it now condemns in its case against Plaintiffs.

***Other Evidence Bearing on the Commission's Motives in Singling Out Plaintiffs***

36.     In federal court, Mr. Chau and Harding would obtain pretrial discovery relating to Daniel J. Nigro, a Senior Structured Products Specialist who joined the Division's investigative Staff in mid-February 2012. In addition to being an investigator for the SEC, Mr. Nigro is a fact witness. He previously worked as the ABS Portfolio Manager for a CDO collateral manager and hedge fund that chose to invest $10 million in Octans I, the very CDO that is at the center of the OIP against Plaintiffs. Mr. Nigro's conflict of interest and bias was likely deepened by the connection between the loss of his ABS Portfolio Manager job and an evaluation of assets performed by a Harding affiliate.

37.     During the Division's investigation, Mr. Nigro was openly hostile toward Harding and made no attempt to feign objectivity. Mr. Nigro's conduct during the investigation, combined with the facts regarding his previous employment, evidenced a deep-seated and personal stake in the results of the investigation.

38.     When various counsel raised concerns about the involvement of a conflicted and biased investigator in the Division's investigation, the Division responded by concluding that no

actual or apparent conflict of interest or bias existed, but that Mr. Nigro would nevertheless be removed from the investigative teams.

39. On December 6, 2013, Plaintiffs' counsel requested, via the Freedom of Information Act (FOIA), information regarding Mr. Nigro's involvement in the Staff's investigation. On February 4, 2014, nearly two months after Plaintiffs' counsel sent their FOIA request, the SEC FOIA Branch Chief responded, issuing a blanket withholding of all records requested by Plaintiffs. The SEC cited the exemption found at 5 U.S.C. § 552(b)(7)(a), which protects from disclosure records compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement activities. The SEC's response does not provide any information regarding how the release of these documents would interfere with its enforcement activities.

40. Unless the Commission's disparate treatment of Plaintiffs is rectified, Plaintiffs will be unable to take a pretrial deposition of Mr. Nigro under Rule 30 of the Federal Rules of Civil Procedure, and the Commission will have succeeded in cutting off further inquiry or fact development regarding fact witness Mr. Nigro, preventing effective appellate review.

41. There is no benign and non-discriminatory explanation for the Commission's filing an action against Mr. Chau and Harding administratively, rather than in federal court, as it has invariably done with similarly situated defendants. To the contrary, the only plausible inference is that the Commission decided to forum shop so that it could shore up a meritless case and flawed investigation by disarming its adversary.

*The Decision To Treat Plaintiffs Differently Is Causing and Will Cause Severe Prejudice*

42.     Plaintiffs are suffering, and will continue to suffer, severe prejudice as a result of the Commission's decision to single them out and deprive them of the ordinary protections they would enjoy in an enforcement proceeding brought in this Court.

43.     Perhaps the most blatant prejudice that Plaintiffs are suffering as a result of the Commission's disparate treatment concerns the inability of AP Rules of Practice to allow Plaintiffs a fair and rational amount of time to find, obtain and make use of exculpatory evidence.

44.     During the more than three years that the Division investigated Plaintiffs, it subpoenaed numerous parties for documents and testimony, and amassed an investigative file exceeding 11.5 terabytes of data—an amount of data that, in printed form, would exceed the entire printed Library of Congress.

45.     After the OIP was issued, the Division produced its massive investigative file to Plaintiffs' counsel several million documents at a time. The Division produced more than 19 million documents that had originated from parties other than Plaintiffs, including key parties such as Merrill, Magnetar, and certain investors.

46.     Prior to institution of the AP, Plaintiffs had requested access to portions of the investigative file, but the Division denied Plaintiffs access to any documents other than copies of the deposition transcripts of Plaintiff Harding's own employee witnesses. We are informed that counsel for other parties in this investigation also requested, without success, access to all or part of the Division's investigative file prior to the institution of charges.

47.     Given the current schedule in the AP, Plaintiffs' counsel will be able to review only approximately 1.1% of the documents produced by the Division by the trial date. The

limited review that Plaintiffs have been able to perform demonstrates that documents of core importance exist among the mountains of material that Plaintiffs would never have had access to prior to issuance of the OIP.

48. The Plaintiffs' attempts to obtain any meaningful relief within the AP process prior to the March 31, 2014 hearing date have proven futile. The ALJ and the Commission have issued rulings denying motions aimed at restoring at least some of the procedural protections being denied to Plaintiffs including, most recently, the Commission's order denying Plaintiffs' petition for interlocutory review ("Order Denying Petition"). Those rulings, in addition to denying all relief, have demonstrated conclusively that the Commission's administrative machinery does not provide a reasonable mechanism for pursuing Plaintiffs' equal protection claims. Plaintiffs have been barred from developing any appellate record regarding the bases for the Commission's disparate treatment of them in the AP forum.

49. The SEC's actions have violated Plaintiffs' rights to equal protection under the law under the Fifth Amendment Due Process Clause applicable to federal agencies.

### The Compelling Need for Judicial Relief

50. Plaintiffs have suffered and will suffer irreparable injury in the AP.

51. Plaintiffs have made every reasonable attempt to obtain concessions within the AP which might ensure fairness. In a motion filed December 20, 2013, the Plaintiffs requested that the ALJ issue an order (1) extending time and granting a six-month adjournment; (2) providing that proceedings would be governed by certain Federal Rules of Civil Procedure; and (3) requiring the Division to provide or identify certain materials. After the ALJ denied that motion, Plaintiffs submitted an emergency motion requesting that the ALJ address the ongoing violations of Plaintiffs' equal protection and due process rights by reconsidering his order or

staying the hearing and prehearing deadlines pending a petition for interlocutory review by the Commission. After the ALJ denied that motion, Plaintiffs submitted a petition for interlocutory review of the ALJ's orders. On March 14, 2014, the Commission issued its Order Denying Petition.

52. Plaintiffs have exhausted every possible potential avenue to determine whether even a modicum of the procedural protections afforded to similarly situated defendants can be available in the AP forum. All of these efforts have been for naught. In addition, there is no viable administrative process to obtain a fair resolution of Plaintiffs' equal protection and due process claims.

## Claim for Relief

53. Plaintiffs repeat and reallege the allegations of paragraphs 1-52, above.

54. By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between Plaintiffs and the Commission concerning whether Plaintiffs' equal protection and due process rights have been violated. It is necessary that these constitutional issues be determined by the Court.

## Jury Demand

55. Plaintiffs hereby demand a trial by jury on all issues so triable.

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

a. A declaration that (i) the Commission's decision to initiate and pursue administrative proceedings against Plaintiffs violated and is violating their right to equal protection under the law, and (ii) the Commission violated and is violating Plaintiffs' right to due process.

b.  A permanent injunction, enjoining the Commission from pursuing its OIP against Mr. Chau or Harding administratively and from otherwise violating their equal protection and due process rights.

c.  Such other and further relief as the Court may deem just and proper, including reasonable attorneys' fees and the costs of this action.

Dated: New York, New York
       March 18, 2014

Respectfully submitted,

NIXON PEABODY LLP

By: _____
    Alex Lipman
    Sean T. Haran
    David A. Feldman
    Ashley Baynham
437 Madison Avenue
New York, New York 10022
(212) 940-3000 (phone)
(212) 940-3111 (fax)
alipman@nixonpeabody.com
sharan@nixonpeabody.com
dfeldman@nixonpeabody.com
abaynham@nixonpeabody.com