UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X

WING F. CHAU and
HARDING ADVISORY LLC,

                                   Plaintiffs,

                 v.

SECURITIES AND EXCHANGE
COMMISSION,

                              Defendant.

--------------------------------------------------------------- X

14-Civ.-1903 (LAK)

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

NIXON PEABODY LLP
Attorneys for Plaintiffs
Harding Advisory LLC
 and Wing F. Chau
437 Madison Avenue
New York, New York 10022
(212) 940-3000

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 4

    1.    Avoidance of Federal Court and the Corresponding Procedural Protections ....... 11

        i.    SEC v Edward Steffelin ......................................................................... 11

        ii.    SEC v Brian Stoker ............................................................................... 12

        iii.    SEC v Fabrice Tourre ........................................................................... 12

    2.    Avoidance of Forum Where Contrary Position Asserted ................................... 13

    3.    Avoidance of Pretrial Discovery Regarding Staff Misconduct ........................... 16

ARGUMENT

THE PLAINTIFFS SHOULD BE GRANTED A TEMPORARY RESTRAINING
ORDER AND A PRELIMINARY INJUNCTION ...................................................... 21

I.    The Standard for Granting Injunctive Relief .................................................... 21

II.    Plaintiffs Have Demonstrated A Substantial Likelihood of Success on the Merits ......... 21

    A.    Plaintiffs are Entitled to Injunctive Relief Because the AP is Being
Conducted In Violation of Plaintiffs' Rights to Equal Protection and Due Process
of Law 22

    B.    This Court Has Subject Matter Jurisdiction Over the Federal Questions
Raised In This Action ................................................................................ 23

    1.    Subject Matter Jurisdiction Is Established Under 28 USC § 1331 ...................... 24

    2.    The Statutory Review Scheme For Final Orders of the Commission Does
Not Strip This Court of Jurisdiction Over Plaintiffs' Claims .............................. 24

        i.    A finding of preclusion would foreclose all meaningful
judicial review...................................................................................... 27

        ii.    Plaintiffs' claims are wholly collateral to the statute's
review provisions ................................................................................. 28

        iii.    Plaintiffs' claims are outside the Commission's expertise ...................... 28

III.    Plaintiffs Will Be Irreparably Harmed If Injunctive Relief Is Not Granted .................... 28

IV.    The Balance Of The Hardships Tips Sharply In Plaintiffs' Favor And An Injunction
Is In The Public Interest............................................................................... 29

CONCLUSION........................................................................................................ 30

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Altman v. SEC,*
    768 F. Supp. 2d 554 (S.D.N.Y. 2011), *aff'd*, 687 F.3d 44 (2d Cir. 2012)...............................26

*Bay Shore Union Free Sch. Dist. v. Kain,*
    485 F.3d 730 (2d Cir. 2007)..................................................................................................24

*Boyle v. County of Suffolk,*
    No. 10-CV-3606, 2010 WL 4340627, 2010 U.S. Dist. LEXIS 114487 (E.D.N.Y. Oct.
    19, 2010) .................................................................................................................................29

*Clubside, Inc. v. Valentin,*
    468 F.3d 144 (2d Cir. 2006)..................................................................................................22

*Free Enterprise Fund v. Public Co. Accounting Oversight Board,*
    130 S. Ct. 3138(2010)..................................................................................................... passim

*George R. Jarkesy v. SEC,*
    No. CA 14-114 (D.D.C. Jan. 31, 2014) .................................................................................27

*Gupta v. SEC,*
    796 F. Supp. 2d 503 (S.D.N.Y. 2011)............................................................................. passim

*M.G. v. New York City Dep't of Educ.,*
    No. 13 Civ. 4639, 2013 U.S. Dist. LEXIS 109018 (S.D.N.Y. Aug. 1, 2013) ........................21

*Red Earth LLC v. United States,*
    657 F.3d 138 (2d Cir. 2011)..................................................................................................21

*SEC v. Goldman Sachs & Co.,*
    No. 10 Civ. 03229 (S.D.N.Y. Apr. 16, 2010) ................................................................. passim

*SEC v. Steffelin,*
    No. 11 Civ. 4204 (S.D.N.Y. June 21, 2011) ................................................................... passim

*SEC v. Stoker,*
    No. 11 Civ. 7388 (S.D.N.Y. Oct. 19, 2011).................................................................... passim

*SEC v. Tourre,*
    No. 10 Civ. 3229, 2014 WL 61864, 2014 U.S. Dist. LEXIS 1570 (S.D.N.Y. Jan. 7,
    2014) .......................................................................................................................................15

*SEC v. Tourre,*
   No. 10 Civ. 3229, 2014 WL 969442, 2014 U.S. Dist. LEXIS 32817 (S.D.N.Y. Mar.
   12, 2014) ........................................................................................................................15

*Shapiro v. Cadman Towers, Inc.,*
   51 F.3d 328 (2d Cir. 1995).............................................................................................28

*Thunder Basin Coal Co. v. Reich,*
   510 U.S. 200, 114 S. Ct. 771 (1994).............................................................................27

**ADMINISRATIVE CASES**

*David F. Bandimere,*
   SEC File No. 3-15124, Initial Decision Release No. 507, 2013 WL 5553898, 2013
   LEXIS 3142 (2013).........................................................................................................23

**FEDERAL STATUTES**

5 U.S.C. § 703(a) ....................................................................................................................25

28 U.S.C. § 2201 .....................................................................................................................24

28 USC § 1331 .........................................................................................................................24

**RULES**

Fed. R. Civ. P. 65 ......................................................................................................................1

SEC Rule of Practice 360, 68 Fed. Reg. 35,787 ...............................................................5, 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

WING F. CHAU and                                    :
HARDING ADVISORY LLC,                               :
                                                    :
                                                    :
                                                    :
                                                    :        14-Civ.-1903 (LAK)
                          Plaintiffs,               :
                                                    :
          v.                                        :
                                                    :
                                                    :
SECURITIES AND EXCHANGE                             :
COMMISSION,                                         :
                                                    :
                          Defendant.                :
                                                    :
------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

Plaintiffs, Wing F. Chau and Harding Advisory LLC ("Harding") (collectively, "Plaintiffs"), by their attorneys, Nixon Peabody LLP, submit this memorandum of law in support of their motion pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction enjoining defendant Securities and Exchange Commission (the "Commission" or "SEC") from continuing its administrative proceeding against Plaintiffs during the pendency of the instant action, and restraining the Commission from proceeding with the administrative hearing that is currently scheduled for March 31, 2014.

## PRELIMINARY STATEMENT

Plaintiffs are respondents in an administrative proceeding (the "AP") brought by the SEC. Congress authorized the SEC to bring certain actions for violations of the federal securities

laws in two ways: administratively before an SEC administrative law judge ("ALJ") or in federal district court. But Congress did not authorize the SEC to forum shop, as it has been done here, in a manner that violates a party's constitutional rights to equal protection and due process. When the SEC sued the plaintiffs in an administrative proceeding (and not in federal district court) it singled Plaintiffs out in an arbitrary manner and deprived Plaintiffs of the rights, remedies and protections that all other similarly situated persons had enjoyed. Without relief from this Court, Plaintiffs' constitutional rights that are now being violated will continue to be violated.

The SEC accuses Plaintiffs of violating the federal securities laws in connection with certain collateralized debt obligations ("CDOs"). The AP is the fourth of four SEC enforcement actions relating to the structuring and marketing of CDOs (a "contested CDO case"). Like each of the other contested CDO cases, the SEC's case against Plaintiffs is highly complex. Like the other cases, it involves synthetic CDOs and other structured-finance instruments that are themselves very complex; allegations concerning billion-dollar transactions and trading strategies relating to those complex investments; key witnesses who are very sophisticated and often based overseas; massive amounts of documents; and disclosure issues that are very fact-specific and thorny.

But Plaintiffs' case is the first and only contested CDO case that the SEC has brought as an administrative proceeding. No doubt due to the complexity of such cases, the SEC brought the other contested CDO cases in this Courthouse, including the much-reported case of *SEC v. Tourre*. As a result, the defendants in those cases were able to prepare adequately for trial in accordance with a reasonable schedule set by the Court. They were able to submit pre-answer motions to dismiss, conduct depositions of potential trial witnesses, and argue the facts to a jury. Plaintiffs here, however, face defending their case in a forum that requires all cases to proceed to

2

trial before an ALJ within approximately four months with no apparent exceptions. This accelerated AP schedule applies regardless of the type and complexity of issues to be tried, the type and amount of evidence, or the amount of data involved.

With this as background, the Order Instituting Proceedings ("OIP") against the Plaintiffs was issued on October 18, 2013 and officially served on them by the SEC's Division of Enforcement (the "Division") on November 18, 2013. As just one measure of the complexity of the SEC's case, Plaintiffs received **22 million documents** from the Division in three electronic productions: roughly 7 million on November 6, 2013; 13 million on November 15, 2013; and 2 million on December 12, 2013. Because the ALJ has no discretionary flexibility or power to fashion a schedule that departs from the Commission's rigid deadlines for holding a hearing or issuing an initial decision, **the trial date is set for March 31, 2014**, approximately four months from the date on which the OIP was served. There were three major federal holidays between then and now: Thanksgiving, Christmas and New Year's.

There is no legitimate, rational reason for the SEC to bring a case of this complexity administratively knowing that it would have to be tried within four months. Moreover, the effect of dumping this much evidentiary data four months before a trial is virtually equivalent to not producing documents at all. But nonetheless the Division states that, at minimum, those mountains of materials may have been "meaningfully consulted" during the Division's multi-year investigation of this matter. Although Plaintiffs' review to date has revealed significant exculpatory evidence, the rules applicable in the AP ensure that other exculpatory evidence will remain buried until after the trial has come and gone.

In the absence of a rational reason for singling Plaintiffs out and treating them differently, one is left with the conclusion that the choice of forum and document dump were part of a

deliberate strategy to improve the SEC's odds in a very weak case, given their previous defeats (described more fully below) in this forum.

Plaintiffs have repeatedly sought relief in the AP, including by seeking a reasonable amount of time to find and effectively use exculpatory evidence. The ALJ, however, does not believe he has the power to grant the relief sought. And the Commission recently denied Plaintiffs' subsequent emergency petition for interlocutory review (the "Petition"). Plaintiffs bring this action in response to the deliberate violation of their due process and equal protection rights under the Unites States Constitution. Those rights, the importance of which cannot be overstated, include the right to present a defense at trial which, in any contested CDO case, is premised in large part on being able to locate, use and present at trial exculpatory evidence that has been produced by the government.

## STATEMENT OF FACTS

### A. Commission's Forum Choice

Whether the SEC brings an enforcement case administratively or in federal district court, the SEC can seek penalties and disgorgement, as well as other equitable relief, such as securities industry bars or orders prohibiting future violations of the federal securities laws.[1] The SEC's ability to bring cases administratively was bolstered when Congress gave it authority as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124

---

[1] *See* 15 U.S.C. § 77h-1(g) (cease-and-desist proceedings pursuant to section 8A of the Securities Act); 15 U.S.C. § 77t (civil actions pursuant to section 20 of the Securities Act); 15 U.S.C. § 80b-3 (administrative and cease-and-desist proceedings pursuant to section 203 of the Advisers Act); 15 U.S.C. § 80b-14 (civil actions pursuant to section 214 of the Advisers Act); 15 U.S.C. § 80a-9 (administrative proceedings pursuant to section 9 of the Investment Company Act); 15 U.S.C. § 80a-43 (civil actions pursuant to section 44 of the Investment Company Act). *See also* 15 U.S.C. §§ 78o(b)(4), 78u-2, 78u-3, 78aa (administrative and cease-and-desist proceedings, and civil actions pursuant to sections 15(b)(4), 21B, 21C, and 27 of the Securities Exchange Act of 1934 (the "Exchange Act").

Stat. 1376 (2010) ("Dodd-Frank") to seek monetary penalties from non-registered individuals in administrative proceedings.

There are no statutory standards that guide the SEC's choice of forum, although SEC officials have stated publicly that the Commission makes the decision based on the particular facts and circumstances of each case, including speed and efficiency, the nature of the case, and the amount of discovery needed.[2]

The Commission has publicly stated its intention to use administrative proceedings more frequently and in a wider variety of more complex cases, including cases that were historically brought in federal district court, *id.*, but it has not changed its procedural rules for administrative actions. The history of these rules is instructive. In 2003, the SEC adopted amendments to its Rules of Practice in response to the perceived need to expedite administrative proceedings. Rules of Practice, 68 Fed. Reg. 35,787 (June 17, 2003). The SEC described the then-existing non-binding goals for the completion of each step of the administrative process, including a ten-month guideline for the ALJ to issue an initial decision, and noted that "the Commission and its administrative law judges have generally failed to meet these goals." *Id.* The Commission adopted amendments to Rule 360, which imposed mandatory deadlines and procedures to meet those deadlines. *Id.*

Pursuant to those 2003 amendments, Rule 360 now divides cases into three categories of complexity, requiring that an ALJ issue an initial decision within 120, 210 or 300 days from service of the OIP. Each of those three categories is further divided into deadlines for holding a

---

[2] *See* Gretchen Morgenson, *At the S.E.C., a Question of Home-Court Edge*, N.Y. TIMES, Oct. 5, 2013, at http://www.nytimes.com/2013/10/06/business/at-the-sec-a-question-of-home-court-edge.html; Thomas P. Cimino & Junaid A. Zubairi, *Highlights from Securities and Exchange Commission (SEC) Speaks 2014*, NAT'L LAW REVIEW, Feb. 28, 2014, at http://www.natlawreview.com/article/highlights-securities-and-exchange-commission-sec-speaks-2014.

hearing, submitting post-hearing briefs, and issuing an initial decision. When the overall deadline is 300 days, Rule 360(a)(2) provides that there shall be approximately four months between service of the OIP and the hearing, approximately two months for the parties to obtain the transcript and submit briefs, and approximately four months after briefing for the ALJ to issue an initial decision. 17 C.F.R. § 201.360(a)(2).

The Commission in effect determines the level of complexity of each administrative proceeding it institutes when it decides which category of Rule 360(a)(2) a case fits into. No administrative proceeding—no matter how complex the subject matter or how voluminous the applicable documents—falls outside of the Rule 360(a)(2) deadlines. In short, no case can be tried later than approximately four months following the service of the OIP. At the same time, there are still only three ALJs at the SEC, meaning that the increasing number of more complex cases is now parceled out to the same small group of three judges, together with all of the more routine cases and certain cases, such as proceedings pursuant to SEC Rule 102(e), which can only be brought administratively.

The Commission should be able to determine whether an administrative proceeding is a fair forum for a particular case simply by asking the Division about the size of its investigative file and the complexity of the issues presented. If the Division has done a thorough review of the investigative file and has separated *Brady* material in advance,[3] a fair hearing may be possible even if the administrative file is large.

The OIP in this case relates to extremely complex transactions—investigated by the specialized unit created for the purpose of developing expertise in complex, structured-finance

---

[3] The Rules require the Division to begin making its investigative file available to a respondent within one week of service of the OIP. Rule 230, 17 C.F.R. § 201.230. The Rules also require the Division to disclose *Brady* and *Jencks* material. Rule 230(b)(2), 231, 17 C.F.R. §§ 201.230(b)(2), 231.

products and aptly named the "Complex Financial Instruments Unit"—and the investigative file consists of some 11.65 terabytes of data, which translates into roughly 22 million documents. The Plaintiffs were not given *Brady* material until January 22, 2014, and the Brady disclosure consisted of a letter describing various statements of witnesses and of copies of certain notes taken during the investigation. No documents were identified as *Brady*; instead the Division took the position that its *Brady* obligations with respect to the documents have been fulfilled by virtue of its production of the entire 22 million document investigative file. (Declaration of Alex Lipman, executed March 19, 2014 ("Lipman Decl.") ¶ 33.).

The fact that this case does not belong in an administrative forum is obvious. The ALJ acknowledged this at the first prehearing conference. In the following colloquy, the ALJ expressly encouraged Plaintiffs to raise the issue with the Commission if they were ever in a position to appeal, but simultaneously stated that the AP forum constrained him from providing any meaningful relief:

> MR. LIPMAN: Your Honor, I have to say that I have to object because I don't know how we can do this by April 1st. If we could start, if we could start at least at the end of April, that's just -- it's a brutal schedule during which there are holidays, and I'm -- frankly, your Honor, I'm staring at the abyss because I don't know what it is that I don't know, and that really concerns me. I understand what your Honor has said, which is that this is not -- the court is under its own various strict deadlines and the Commission chooses to bring a case in an administrative proceeding that historically would be brought in a Federal District Court, where the schedule is very different and where there is time to learn the record and narrow the issues before you get to trial. It really disadvantages a respondent in this way. Even a criminal case like this, with this kind of complexity, would take a very long time to get ready, even despite the speedy trial rule.
>
> JUDGE ELLIOT: You know what, I agree with you. You can waive the speedy trial rule in District Court. I can't and you can't and the Division can't waive the 300-day rule. The only entity that could waive that is the Commission. So I have to apply -- I am not allowed to apply to the Commission. I don't have the authority to ask them to extend it. I have to

go through the chief ALJ to do that and she won't do it -- she won't file a motion with them until we get to within about 30 days of the due date of the initial decision. So I hear what you're saying, Mr. Lipman. I am sympathetic. I know nothing about this case, I have no idea what the outcome is going to be. If you are ever in a position to appeal, I encourage you to raise this with the Commission. This is a recurring problem. Unfortunately, except for what you mentioned a moment ago about witness lists and Brady and so forth, there is nothing I could do about it. So I will overrule your objection and will start March 31st in Washington, DC....

(Lipman Decl. ¶¶ 9, 10, Ex. 5 at 30-31.)

## B. **The OIP**

The gist of the OIP is that Plaintiffs committed fraud in connection with the creation and marketing of a $1.5 billion CDO, known as Octans I CDO Ltd. ("Octans I), for which Harding served as collateral manager. The OIP alleges that Merrill Lynch & Co. ("Merrill") structured and marketed Octans I and that Magnetar Capital LLC ("Magnetar") bought the deal equity. (OIP ¶¶ 3, 18, 19, 22.) The OIP further alleges that investors in Octans I were led to believe that Harding selected the collateral assets for the CDO, but that Magnetar had an undisclosed role in the collateral selection and had received undisclosed rights under the applicable warehouse agreement. (OIP ¶¶ 18, 28, 59.) The OIP goes on to allege that Magnetar's interests were "not aligned" with the interests of the investors who bought Octans I and, as a result, the alleged failure to disclose Magnetar's involvement in asset selection violated the securities laws. (OIP ¶¶ 25, 70-73.) The OIP asserts that Plaintiffs were motivated by their desire to ingratiate themselves with Merrill and Magnetar for the purpose of doing additional CDO deals with them and thereby earning additional fees. (OIP ¶ 8.)

Separately, the OIP alleges that as part of their effort to curry favor with Merrill and Magnetar, Plaintiffs agreed to buy certain notes issued by another Merrill/Magnetar CDO, the Norma CDO I ("Norma"), despite having a "basically unfavorable" view of the notes. (OIP

8

¶¶ 60-69.) Plaintiffs are alleged to have placed the Norma notes in several other CDOs that they managed to the purported detriment of investors in those CDOs. (OIP ¶¶ 66-68.) Finally, the OIP alleges that Plaintiffs failed to meet the standard of care that they represented they would meet in connection with Octans I and the unnamed CDOs into which Norma notes were placed. (OIP ¶¶ 6, 68.)

On October 18, 2013, the Commission commenced the AP by issuing the OIP pursuant to Section 8A of the Securities Act of 1933 (the "Securities Act"), Sections 203(e), 203(f), and 203(k) of the Investment Advisers Act of 1940 (the "Advisers Act"), and Section 9(b) of the Investment Company Act of 1940 (the "Investment Company Act"). The OIP seeks, among other relief, civil penalties. (OIP at 13-14.)

## C. **Plaintiffs' Disparate Treatment**

Prior to issuing the OIP, the Commission had brought three other contested CDO cases which, in all material respects, are virtually identical to this case: (1) *SEC v. Steffelin*, No. 11 Civ. 4204 (S.D.N.Y. June 21, 2011) ("*Steffelin*"); (2) *SEC v. Stoker*, No. 11 Civ. 7388 (S.D.N.Y. Oct. 19, 2011) ("*Stoker*"); and (3) *SEC v. Goldman Sachs & Co.*, No. 10 Civ. 03229 (S.D.N.Y. Apr. 16, 2010) ("*Tourre*"). A striking similarity among the four contested CDO cases—in terms of complexity, violations alleged, amounts of money at issue, legal theories involved, and penalties sought—is manifest. (*See* Chart (Lipman Decl. ¶ 18, Ex. 12.)

The Commission brought all three of the prior contested CDO cases in the United States District Court for the Southern District of New York. Given the nature and complexity of the cases, it made perfect sense that they were brought in federal district court. The defendants in the other three cases enjoyed and made effective use of the procedural protections of federal court. In *Steffelin*, before the Commission decided to drop its case altogether, a district judge partially

granted a motion to dismiss and ordered immediate pretrial discovery of a potentially key defense witness. In *Stoker* and *Tourre*, the defendants were able to argue their case to a jury, and the defendant in *Tourre* was able to conduct substantial pretrial discovery, including discovery of persons located overseas. In all three cases, the defendants were able to prepare adequately for trial in accordance with a reasonable schedule set by the district judge.

Plaintiffs, by contrast, are receiving none of the crucial protections that were available in *Steffelin*, *Stoker*, and *Tourre*. Because the Division brought suit against Mr. Chau and Harding in an administrative proceeding, Plaintiffs' case is the first contested CDO case in which a party was deprived of the ability to move to dismiss charges that, on their face, fail to plead a violation of law, conduct depositions of potential trial witnesses, and argue the facts to a jury if necessary. Plaintiffs also have been required to mount a defense within approximately four months, as opposed to the 17 months that preceded dismissal in *Steffelin*, the eight months that preceded trial in *Stoker*, or the more than three years that preceded the *Tourre* trial. (*See* Complaint, dated March 18, 2014 (the "Complaint") ¶¶ 32, 33, 34; Lipman Decl. Exs. 14, 17, 20.)

When we asked the Division for the reasons why Mr. Chau and Harding were treated differently than the rest, we did not receive an explanation. But the reasons seem apparent, and have all of the hallmarks of a deliberate attempt by the Division to put Plaintiffs at an unfair and unnecessary disadvantage. (Complaint ¶ 41.) In addition to a desire to improve its odds by burying Plaintiffs in paper (knowing that the Commission requires hearings to occur within approximately four months of service of the OIP), the likely reasons that the Division wanted to avoid federal court include the following:

First, the Division's success rate in the contested CDO cases it brought in this Court has been mixed at best. The Division withdrew all of its charges and consented to dismissal of its complaint in *Steffelin*, and a jury found against the Division on all of its charges in *Stoker*.

Second, although the Division won at trial in *Tourre*, it did so based on proof, legal theories, and assertions about industry standards that govern the conduct of collateral managers and the structuring and marketing of CDOs that are, quite simply, diametrically opposed to the Division's assertions of fact and law in this case.

Third, we suspect that the Division wished to avoid discovery concerning a conflict of interest that infected the integrity of the Staff's investigation. During a crucial period of the investigation, the Staff's personnel included a Senior Structured Products Specialist with a deep-seated bias against Mr. Chau and Harding and a personal stake in the investigation's results.

In the absence of any rational basis for the Commission's disparate treatment of Plaintiffs, these apparent—and unlawful—bases provide the most likely explanation.

## 1.  Avoidance of Federal Court and the Corresponding Procedural Protections

### i.  *SEC v Edward Steffelin.*

The Commission commenced the *Steffelin* case on June 21, 2011 by filing a complaint in the United States District Court for the Southern District of New York against Edward Steffelin, a former employee of GSC Capital Corp., which, like Harding, served as collateral manager in various CDO transactions.

That case, like this one, was based on allegations concerning the undisclosed "involvement" of Magnetar in the portfolio selection process for a $1.1 billion CDO. (*See* Complaint in *Steffelin* (Lipman Decl. Ex. 13) at ¶ 2.) Two months later, on August 30, 2011, Mr. Steffelin moved to dismiss the complaint. After hearing oral argument on October 25, 2011,

United States District Judge Miriam Goldman Cedarbaum dismissed the Commission's claim under Section 17(a)(3) of the Securities Act. Mr. Steffelin thereafter filed an answer regarding the remaining claims. (*See* Docket Sheet in *Steffelin* (Lipman Decl. Ex. 14).)

Judge Cedarbaum held a status conference on April 24, 2012 during which she, *inter alia*, called into question the merits of the Commission's theories of liability. On November 8, 2012, prior to the completion of discovery, the Commission voluntarily dismissed the remainder of its claims. Judge Cedarbaum then executed the parties' stipulation of dismissal with prejudice on November 16, 2012, seventeen months after the Commission's complaint had been filed. (*See* Lipman Decl. Exs. 14 and 15.)

### ii. *SEC v Brian Stoker.*

The Commission filed its complaint in the *Stoker* case in the United States District Court for the Southern District of New York (Rakoff, J.) on October 19, 2011. Brian Stoker was a Citigroup employee who had served as a director in the bank's CDO structuring group. The Commission alleged that Stoker, in connection with the offering of Class V Funding III, a $1 billion CDO, failed to disclose Citigroup's "influence" over the CDO asset selection process being performed by collateral manager Credit Suisse Alternative Capital, LLC. (*See* Complaint in *Stoker* (Lipman Decl. Ex. 16) at ¶¶ 2, 9.) After discovery and motion practice, the parties proceeded to trial on July 16, 2012, eight months after the filing of the Commission's complaint. On July 31, 2012, the jury found Stoker not liable for any of the securities law violations that had been alleged. (*See* Docket Sheet and Judgment in *Stoker* (Lipman Decl. Exs. 17, 18).)

### iii. *SEC v Fabrice Tourre.*

The *Tourre* case was commenced when the Commission filed a complaint in the Southern District of New York on April 16, 2010; the Commission filed an amended complaint

on November 22, 2010. The amended complaint alleged that the offering circular and marketing materials for a CDO, ABACUS 2007-AC1 ("Abacus"), failed to disclose that a hedge fund, Paulson & Co. ("Paulson"), had played a significant role in the portfolio selection process undertaken by the collateral manager, ACA Management LLC ("ACA"). The amended complaint further alleged that Paulson's interests were directly adverse to investors in Abacus because Paulson shorted the portfolio it had helped select, and that neither Paulson's adverse interests nor its role in the portfolio selection process had been disclosed to investors. (*See* Amended Complaint in *Tourre* (Lipman Decl. Ex. 19) at ¶¶ 2-3.)

On December 9, 2010, Tourre moved to dismiss the amended complaint; United States District Judge Barbara Jones granted the motion in part and denied it in part on June 10, 2011. After substantial pretrial discovery, including discovery of persons located overseas, both parties moved for partial summary judgment on March 1, 2013. Trial began on July 15, 2013 before Judge Katherine B. Forrest, some 27 months after the Commission had filed its amended complaint and more than three years after the initial complaint was filed. On August 1, 2013, the jury found Tourre liable on six claims. (*See* Docket Sheet in *Tourre* (Lipman Decl. Ex. 20).) However, as discussed below, the Commission secured its victory against Tourre by eliciting proof and by making factual and legal arguments that directly contradict its theory of liability in this case.

### 2.   Avoidance of Forum Where Contrary Position Asserted

The circumstances suggest that the Division wished to avoid this forum in the case against Plaintiffs because its theory of liability directly contradicts the position it took in the *Tourre* case. The Division embraced conduct in *Tourre* that it now condemns.

One of the allegations in *Tourre* was that Tourre defrauded ACA by leading it to believe that Paulson was an equity investor in Abacus. This allegation became a key issue at trial. In *Tourre*, the Division recognized that it was not unusual for equity investors to have input into assets that went into a CDO portfolio, and that it was not unusual for equity investors to hedge their long equity position by shorting some portion of the capital structure of the same portfolio. (Lipman Decl. ¶ 22, Ex. 22 at 2564, 2744.) In fact, as the Division knew, the collateral manager in that case, ACA, had also served as collateral manager on other deals with investors who were both long and short and who had involvement in portfolio selection. In one of those deals, ACA Aquarius 2006-1 ("Aquarius"), hedge fund Magnetar bought the equity, took on warehouse risk, had the right to veto certain collateral, and shorted a higher tranche of the collateral structure as a hedge to its equity position. (Keep in mind that in the case against Plaintiffs, the Division alleges that Magnetar bought the equity, took on warehouse risk, had the right to veto certain collateral, and shorted a higher tranche of the collateral structure as a hedge against its position in Octans I.)

During the *Tourre* trial, the Division used ACA's conduct as collateral manager in the Aquarius deal—a deal that, in all material respects, is virtually identical to Octans I, the deal at issue in the AP—to illustrate comportment with relevant standards of care. The Division also drew a contrast with the scenario in the Abacus deal, where portfolio selection was alleged to have been influenced by a "purely short" investor. Specifically, the Division elicited testimony (primarily from Laura Schwartz, the ACA employee responsible for asset selection in Aquarius and Abacus) and argued to the jury in its summation that: (a) it was common for hedge funds to be long and short in CDO deals; (b) having equity in Aquarius was enough "skin in the game" to align Magnetar's interests with those of note purchasers despite Magnetar's short positions; (c) Magnetar's veto rights in the warehouse were explained by the fact that it took warehouse

risk; and (d) Magnetar's participation in asset selection was not uncommon as it was an equity investor. (*See* Lipman Decl. ¶¶ 22, 23, Exs. 21, 22.)

Based on Judge Forrest's post-trial rulings, there can be no doubt that these arguments were significant in preserving the SEC's result. In denying Tourre's motion for a directed verdict and new trial, Judge Forrest found that "[t]he jury could reasonably infer from this record evidence that the entirety of Tourre's conduct in connection with the [Abacus] transaction constituted part of a scheme to support ACA's belief that Paulson was a long investor." *SEC v. Tourre*, 10 Civ. 3229 (KBF), 2014 WL 61864, at *5, 2014 U.S. Dist. LEXIS 1570, at *16 (S.D.N.Y. Jan. 7, 2014). And in a recent opinion concerning the imposition of penalties against Tourre, Judge Forrest stated, "The deception of ACA thus produced the half-truth included in the offers identified by the SEC—that the portfolio was 'selected by ACA' while leaving out any mention of Paulson." *SEC v. Tourre*, 10 Civ. 3229 (KBF), 2014 WL 969442, at *12, 2014 U.S. Dist. LEXIS 32817, at *40 (S.D.N.Y. Mar. 12, 2014) (emphasis in original.)

In stark contrast to the Commission's proof and arguments in *Tourre*, the Division now claims that Harding violated the law by acting in a manner that the Division embraced in the *Tourre* case. There is no evidence or allegation that Magnetar, the equity investor, was purely short in Octans I. Indeed, the crux of the case against Mr. Chau and Harding, as alleged in the OIP, is that they selected assets for Octans I in precisely the same manner that its star witness, ACA, selected assets in the Aquarius deal. But in Plaintiffs' case, in flat and direct contradiction with the positions it strenuously argued in *Tourre*, the Division suggests that the Plaintiffs engaged in misconduct. The core allegation in the OIP is that:

> Chau understood that Magnetar was interested in investing as the equity buyer in a series of potential CDO transactions. Chau also understood that Magnetar's strategy included "hedging" its equity positions in CDOs, potentially by taking short positions on RMBS or certain tranches of

15

CDOs, including the CDOs it was investing in. Chau therefore understood that, because Magnetar stood to profit if the CDOs failed to perform, Magnetar's interests were not aligned with those of potential investors in the debt tranches of Octans I, whose investment depended solely on the CDO performing well.

(OIP at ¶ 25; *see also* ¶¶ 24, 27, 28, 29.) In other words, what the Division argued to be alignment of interests in *Tourre*, it now argues to be *misalignment* of interests with respect to identical facts involving Plaintiffs in a deal with the same hedge fund and identical structure and purpose.

Once more, the Division has not explained why it decided that this Courthouse was no longer the appropriate forum—even though it has previously brought every other case like this one here. We submit that the uncomfortable prospect of having to explain to a federal judge in this Courthouse—perhaps even Judge Forrest herself—why it should be permitted to take two flatly inconsistent positions, is one reason why the SEC wants to avoid this forum.

### 3. Avoidance of Pretrial Discovery Regarding Staff Misconduct

In federal court, Mr. Chau and Harding would obtain pretrial discovery relating to a Senior Structured Products Specialist who joined the Division's investigative Staff in mid-February 2012, including but not limited to a pretrial deposition under Rule 30 of the Federal Rules of Civil Procedure. In addition to being an investigator for the SEC, this individual, Daniel J. Nigro, was a fact witness. He previously worked as the ABS Portfolio Manager for a CDO collateral manager and hedge fund that chose to invest $10 million in Octans I, the very CDO that is at the center of the OIP against Plaintiffs. (*See* Lipman Decl. ¶¶ 25, 27, Ex. 26.) Mr. Nigro's conflict of interest and bias was likely deepened by the connection between the loss of his ABS Portfolio Manager job and an evaluation of assets performed by a Harding affiliate. (*See* Lipman Decl. ¶¶ 25, 28, Ex. 27.)

It seems undisputed that during the Division's investigation, Mr. Nigro was openly hostile toward parties that had a role in Octans I, including Harding. His animus toward Plaintiffs may have had a significant and lasting impact on the investigation and the Staff handling it, up to and including the Staff's recommendation to the Commission concerning a proceeding against Mr. Chau and Harding. Mr. Nigro certainly participated in key aspects of the Division's investigation and was in a position to significantly influence the Staff's deliberations at a critical stage. (*See* Lipman Decl. ¶ 26, Exs. 28, 29) When various counsel raised concerns about the involvement of a conflicted and biased investigator in the Division's investigation (*see* Lipman Decl. ¶ 29, Exs. 25-27), however, the Division responded by concluding that (i) "no actual or apparent conflict of interest or bias exists that presents a basis for [Mr. Nigro's] recusal from these matters," but (ii) the Division had nevertheless elected to remove Mr. Nigro from the investigative teams. (*See* Aug. 2, 2012 Letter (Lipman Decl. Ex. 24).)

In the AP, the Division is able to avoid virtually all pretrial discovery and prevent Plaintiffs from developing additional facts relating to Mr. Nigro's twin role as fact witness and SEC investigator, and to avoid disclosure of the extent to which his participation infected the investigative team with animus against Plaintiffs. Plaintiffs have sought to obtain additional information concerning this issue via a FOIA request, but the SEC has declined to furnish any such information. (*See* Lipman Decl. ¶¶ 30-32, Exs. 30-32.)

## D. **The Document Dump**

The Division's investigative file—roughly equivalent in volume to the printed documents of the entire Library of Congress—was produced via hard drives containing 131 separate databases. The Division has represented (without identifying specific documents) that each of the databases is from a file that, at minimum, may have been "meaningfully consulted" during the

investigation of this matter. Most of the documents produced, approximately 19.9 million, came from productions originally made to the Division by third parties, *i.e.*, they were not available to Plaintiffs until after the Division produced them. (Lipman Decl. ¶¶ 34, 35.)

These third-party documents were never vetted by Plaintiffs' counsel or any party for information that is relevant or exculpatory only as to Plaintiffs. Indeed, Plaintiffs' review subsequent to the OIP has resulted in discovery of a number of highly exculpatory documents that were not addressed in any testimony, or in any submissions made to the Commission prior to the OIP. Additional exculpatory documents will remain buried in the investigative file until after the AP is completed, because the Division has declined to identify *Brady* material from within its voluminous document productions, and the mandatory March 31 hearing date does not come close to affording sufficient time for a respondent to identify such material on its own.

To be clear, Plaintiffs understand that a page-by-page review of the investigative file would be impossible in any forum. (*See* Declaration of Ashley Baynham in Support of the Dec. 20 Motion (Lipman Decl. Ex. 10) ¶¶ 24-25.) But without injunctive relief, Plaintiffs' counsel will have had an opportunity to review only approximately 1.1% of the documents before the March 31 trial. (*See* Declaration of Ashley Baynham in Support of Respondents' Petition for Interlocutory Review, dated February 25, 2014 (Lipman Decl. Ex. 35) ¶ 5.)[4] Given the impossibility of finding the needles of exculpatory evidence in the haystacks of the investigative

---

[4] The Division's electronic productions also presented obstacles to Plaintiffs' trial preparation beyond sheer volume. The databases included inconsistent "metadata" fields, which meant that, even after expending weeks to process the documents for review, it remained impossible to identify relevant documents by performing straightforward electronic searches. By way of example, instead of a single search for a particular person's communications on a particular date, it is necessary to perform, at minimum, 131 separate searches. Most of the productions from investors were not identified or labeled but rather exist within 10,000 "Staff Emails," and other key sets of materials are located in folders called "other" or "miscellaneous." The SEC provided no index of what they were producing, but rather referred counsel to the subpoenas and over 400 production letters. (Lipman Decl. ¶¶ 13, 14).

file, along with the fact that Plaintiffs—unlike every other similarly situated person—are being deprived of pretrial motions (which have succeeded in prior cases), depositions (which would allow for narrowing of the issues and possibly successful summary judgment motions), a reasonable schedule for other pretrial discovery given the complexity of the matters at issue, and a jury trial (which was also successful for a defendant in a prior case), the prejudice to Plaintiffs is profound.

## E.  The Commission's Refusal to Address the Constitutional Violations

Plaintiffs have now exhausted every possible pretrial avenue to determine whether even a modicum of the procedural protections afforded in other contested CDO cases might be available in the AP forum. In a motion filed on December 20, 2013 (the "Dec. 20 Motion"), Plaintiffs requested that the ALJ issue an order (1) extending time and granting a six-month adjournment; (2) providing that proceedings would be governed by certain Federal Rules of Civil Procedure; and (3) requiring the Division to provide or identify certain materials. (Dec. 20 Motion (Lipman Decl. Ex. 7).)

The ALJ denied the Dec. 20 Motion on January 24, 2014 (the "Jan. 24 Order"). The ALJ found it "dispositive" that a six-month adjournment would exceed the deadlines set forth in Rule 360(a)(2). (Jan. 24 Order (Lipman Decl. Ex. 11) at 1.) On February 14, 2014, Plaintiffs submitted an emergency motion (the "Feb 14 Motion") requesting that the ALJ address the ongoing violations of Plaintiffs' equal protection and due process rights by reconsidering the Jan. 24 Order or staying the hearing and prehearing deadlines pending a petition for interlocutory review. The Feb. 14 Motion was denied in an order dated February 19, 2014 (the "Feb. 19 Order"). (Feb. 14 Motion (Lipman Decl. Ex. 33); Feb. 19 Order (Lipman Decl. Ex. 34).)

On February 26, 2014, Plaintiffs filed a petition for interlocutory review of the ALJ's orders and an emergency motion to stay the hearing and prehearing deadlines (the "Petition"). The Commission denied the Petition on March 14, 2014 ("Order Denying Petition"). The Commission's order, combined with the ALJ's earlier orders, demonstrates that the there exists no viable mechanism for pursuing Plaintiffs' equal protection claim in the AP. The harm to Plaintiffs' rights persists.

The Commission has not adopted any known standards for identifying cases in which the maximum 300-day deadline for issuing an initial decision, or the approximately four-month deadline for proceeding to trial, may be insufficient. Nor has that the Commission addressed the potential for disparate treatment among similarly situated parties in highly complex cases to violate respondents' equal protection rights. Indeed, the Commission apparently views any deprivations of equal treatment and due process in connection with an administrative hearing as irreversible once an AP is commenced.

Plaintiffs' Petition had squarely presented the question of whether Rule 360(a)(2) is intended to require that every administrative proceeding—regardless of complexity, volume of evidence, or any other factor—be tried no more than approximately four months from service of the OIP. (Petition (Lipman Decl. Ex. 35) at 19.) The question was inherent in the ALJ's professed lack of authority to order any of the relief requested in the Dec. 20 Motion or the Feb. 14 Motion, and in the ALJ's statement at the November 18, 2013 conference that "I can't and you can't and the Division can't waive the 300-day rule. The only entity that could waive that is the Commission." (Lipman Decl. ¶¶ 9, 10, Ex. 5 at 30-31.)

But the Commission refused to address the question of law inherent in the ALJ's statements. Instead, the Commission simply ignored both the question of law and the statements

themselves, concluding that "the law judge appears to have been reasonably managing these proceedings." (Order Denying Petition (Lipman Decl. Ex. 38) at 7.) The Commission also cited the likelihood for "delay" as an independent reason for its refusal to entertain a petition regarding the unfairness of holding an administrative hearing within the time allotted. (*Id.* at 7-8.) The Order Denying Petition did not specify any reasons for the Commission's disparate treatment of Plaintiffs, nor did it hint at how such reasons could possibly be explored within the AP either before or after trial.[5]

## ARGUMENT

## THE PLAINTIFFS SHOULD BE GRANTED A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

### I.   The Standard for Granting Injunctive Relief

A party is entitled to a temporary restraining order and/or preliminary injunctive relief when it has shown that (1) it has a substantial likelihood of success on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *See Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (quoting *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010)); *M.G. v. New York City Dep't of Educ.*, No. 13 Civ. 4639, 2013 WL 3974165, at *3, 2013 U.S. Dist. LEXIS 109018, at *8-9 (S.D.N.Y. Aug. 1, 2013); *see also* Fed. R. Civ. P. 65(b).

As demonstrated below, Plaintiffs have satisfied each of the foregoing elements and are therefore entitled to temporary and preliminary injunctive relief.

### II.  Plaintiffs Have Demonstrated A Substantial Likelihood of Success on the Merits

---

[5] The Commission repeatedly referenced the procedural mechanisms for post-decision review of judgments, but declined to acknowledge that the post-decision review would occur without the benefit of a developed record on these issues.

**A. Plaintiffs are Entitled to Injunctive Relief Because the AP is Being Conducted In Violation of Plaintiffs' Rights to Equal Protection and Due Process of Law**

An arbitrary and irrational government decision to impose disparate treatment on a person violates the person's equal protection rights under the Constitution. *See Gupta v. SEC*, 796 F. Supp. 2d 503, 513 (S.D.N.Y. 2011) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564-66, 120 S. Ct. 1073, 1074-75 (2000)). Successful equal protection claims may be brought by a "class of one" where a person has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment. *Id.* Mr. Chau and Harding will likely succeed on their equal protection claim because no rational person could regard their circumstances to differ from those of a comparator to a degree that would justify the differential treatment on the basis of government policy, and their similarity in circumstances and difference in treatment excludes any possibility that the Division or the Commission acted by mistake. *See Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citing *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005)).

There is no discernible difference between this case and the other contested CDO cases—in terms of complexity, violations alleged, amounts of money at issue, the legal theories involved, or the penalties sought. Like each of the contested CDO cases that preceded it, the case against Plaintiffs was brought after a lengthy investigation by the Division. Like each of the other contested CDO cases, Plaintiffs' case involves synthetic CDOs and other highly complex derivative investments; allegations concerning billion-dollar transactions and trading strategies relating to those complex investments; massive amounts of documents; and key witnesses located outside of the United States. Yet, as the SEC would have it, Plaintiffs' case, and only Plaintiffs' case, should be tried on the SEC's home turf in an administrative proceeding.

22

There is no rational basis for determining that contested CDO cases should be tried in an administrative proceeding. And there is certainly no rational basis for determining that Plaintiffs should be singled out as the only contested CDO case to be tried in an AP instead of federal district court. In each of the other contested CDO cases, a United States District Judge was able to set a trial schedule and issue other appropriate rulings given the nature and complexity of the case before him or her. To date, neither the Division nor the Commission has attempted to articulate a rational basis for depriving Plaintiffs of all of the protections of a federal civil case.

## B. This Court Has Subject Matter Jurisdiction Over the Federal Questions Raised In This Action

The various orders issued in the AP indicate that the Commission does not view equal protection and due process claims as being justiciable in that forum. For example, the ALJ has stated that he doubts he has the authority to adjudicate arguments "pertain[ing] to due process and equal protection." (Feb. 19 Order (Lipman Decl. Ex. 34) at 2). The ALJ has previously acknowledged his lack of authority to "second-guess the Commission's decision to issue the OIP." *David F. Bandimere*, SEC File No. 3-15124, Initial Decision Release No. 507, 2013 WL 5553898, at *72, 2013 LEXIS 3142, at *215-17 (Oct. 8, 2013).

Because Plaintiffs cannot develop a factual record within the AP concerning the reasons for the Commission's disparate treatment, all meaningful judicial review will be foreclosed if this Court cannot exercise jurisdiction. In the circumstances present here, this Court has jurisdiction over Plaintiffs' claims. *See Free Enterprise Fund v. Public Co. Accounting Oversight Board*, __ U.S. __, 130 S. Ct. 3138, 3150 (2010); *Gupta v. SEC*, 796 F. Supp. 2d 503 (S.D.N.Y. 2011).

1.  **Subject Matter Jurisdiction Is Established Under 28 USC § 1331**

Federal district courts have original jurisdiction of all civil actions arising under the

Constitution or laws of the United States. 28 U.S.C. § 1331. A case arises under federal law

within the meaning of section 1331 if "a well-pleaded complaint establishes either that federal

law creates the cause of action or that the plaintiff's right to relief necessarily depends on

resolution of a substantial question of federal law." *Bay Shore Union Free Sch. Dist. v. Kain*, 485

F.3d 730, 734-35 (2d Cir. 2007) (quoting *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S.

677, 690, 126 S. Ct. 2121, 2131 (2006)). In most cases of actual controversy within its

jurisdiction, a federal district court may "declare the rights and other legal relations of any

interested party" upon the filing of an appropriate motion. 28 U.S.C. § 2201.

The Complaint requests that the Court enter a declaratory judgment that (i) the

Commission's decision to initiate and pursue administrative proceedings against Plaintiffs

violated and is violating their right to equal protection under the law, and (ii) the Commission

violated and is violating Plaintiffs' right to due process. The Complaint therefore pleads claims

arising under the Constitution and laws of the United States, and this Court has subject matter

jurisdiction under section 1331 to grant relief under section 2201. *See Gupta*, 796 F. Supp. 2d at

508 (citing *Free Enterprise*, 130 S. Ct. at 3150 and *Califano v. Sanders*, 430 U.S. 99, 104-07, 97

S. Ct. 980, 983-85 (1977)).

2.  **The Statutory Review Scheme For Final Orders of the Commission
    Does Not Strip This Court of Jurisdiction Over Plaintiffs' Claims**

Plaintiffs' claims may be litigated in this forum notwithstanding the existence of a

statutory scheme for review of final Commission orders.[6] The Order Denying Petition

---

[6] The statutory review scheme applicable to the OIP is set forth in Section 9 of the
Securities Act, 15 U.S.C. § 77i(a); Section 23 of the Advisers Act, 15 U.S.C. § 80b-13(a); and
Section 43 of the Investment Company Act, 15 U.S.C. § 80a-42(a). Each of these statutes

demonstrates that, in the AP, Plaintiffs' equal protection claims could be considered, if at all, only after (i) a hearing in which there is no opportunity to develop a record concerning the bases for the Commission's disparate treatment, and (ii) first-level appellate review by the Commission itself. (Lipman Decl. Ex. 38 at 8-9.) The Commission's order thus implicitly acknowledges that the review scheme does not provide an adequate mechanism to address Plaintiffs' claims. As a result, the Complaint and application for injunctive relief should proceed in this forum. *See Gupta*, 796 F. Supp. 2d at 511; *see also* 5 U.S.C. § 703(a).[7]

In *Gupta*, the Commission argued that section 25(a)(1) of the Exchange Act, when read together with section 703 of the APA, prevents this Court from exercising jurisdiction over claims asserted by a respondent in an administrative proceeding. Judge Rakoff rejected that argument, stating:

> Although the SEC contends that the two provisions together establish that review of any SEC proceeding is available only in a United States court of appeals and only after the administrative proceeding is completed...in fact the two statutes, on their face, provide that a lawsuit challenging any

---

describes an identical procedure for appealing a final order of the Commission to the United States Court of Appeals. The same procedure is also set forth in Section 25(a)(1) of the Exchange Act, 15 U.S.C. § 78y(a).

[7] Section 703 of the APA provides that:

> The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence *or inadequacy* thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

5 U.S.C. § 703(a) (emphasis added).

action by the SEC may be brought in any court of competent jurisdiction if the statutorily-provided review of final SEC orders by the courts of appeal is in some relevant respect inadequate: the very issue presented here.

*Gupta*, 796 F. Supp. 2d at 511.

None of the statutory provisions for review of final Commission orders expressly limits the jurisdiction that other statutes, such as 28 U.S.C. §§ 1331 and 2201, confer on this Court. And the Supreme Court has made clear that a statutory review scheme restricts judicial review only if the scheme "displays a 'fairly discernible' intent to limit jurisdiction, and the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Free Enterprise*, 130 S. Ct. at 3150 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212, 114 S. Ct. 771, 776, 779 (1994)). Accordingly, the statutory review scheme may allow a district court to adjudicate an equal protection claim in an appropriate case even if it might limit jurisdiction in other cases.

In *Gupta*, when Judge Rakoff rejected the Commission's argument that the Court's jurisdiction was limited by section 25(a) of the Exchange Act together with section 703 of the APA, he referenced a case decided by Judge Holwell, *Altman v. SEC*, 768 F. Supp. 2d 554 (S.D.N.Y. 2011), *aff'd*, 687 F.3d 44 (2d Cir. 2012), as being one in which the review scheme "may" limit jurisdiction. *See Gupta*, 796 F. Supp. 2d at 512.[8] And a district judge in the District of Columbia recently declined to exercise jurisdiction in a case brought by a fund manager

---

[8] In *Altman*, an attorney sought an injunction in district court after the Commission had issued a final order sanctioning him with a lifetime ban from practicing before the SEC. 768 F. Supp. 2d at 558. Altman based his due process and equal protection claims on a theory that the Commission's rules relating to attorney conduct—*i.e.*, the provisions going to the heart of Altman's case—wrongfully usurped power properly held by the New York State court system. *Id.* at 558, 561.

facing an SEC administrative proceeding. *George R. Jarkesy v. SEC*, No. CA 14-114 (D.D.C. Jan. 31, 2014) (Lipman Decl. Ex. 39.)[9]

But it is presumed that Congress does *not* intend to limit jurisdiction where, as here, (1) "a finding of preclusion could foreclose all meaningful judicial review"; (2) the suit is "wholly collateral to a statute's review provisions"; and (3) the claims are "outside the agency's expertise." *See Free Enterprise*, 130 S. Ct. at 3150; *Thunder Basin*, 510 U.S. at 212-13, 114 S. Ct. at 779; *Gupta*, 796 F. Supp. 2d at 512.

### i.  *A finding of preclusion would foreclose all meaningful judicial review.*

The rulings by the ALJ and the Commission demonstrate that the SEC's "administrative machinery" does not provide a reasonable mechanism for pursuing Plaintiffs' equal protection claim. *See Gupta*, 796 F. Supp. 2d at 513. Plaintiffs' equal protection claim turns entirely on extrinsic evidence of whether the SEC's decision to treat Plaintiffs differently from the defendants in the other contested CDO cases was irrational, arbitrary, and discriminatory. Yet no such extrinsic evidence can be explored within the AP, and no administrative record bearing on it will be developed for any federal appellate court to review. *Cf. Gupta*, 796 F. Supp. 2d at 514.

Because there is no avenue for developing Plaintiffs claims within the AP, Plaintiffs, at minimum, would be forced to endure the very proceeding they allege is the device by which unequal treatment is being visited upon them. *Id.* at 513 (citing *Touche Ross & Co. v. SEC*, 609 F.2d 570 (2d Cir. 1979)). The Commission's Rules of Practice do not permit counterclaims against the SEC, nor do they allow for the kind of discovery of SEC personnel that would be necessary to elicit admissible evidence corroborative of such a claim. *Id.*

---

[9] In *Jarkesy*, the judge declined to find the existence of an equal protection claim due to a lack of identically situated defendants treated differently. The judge also—mistakenly, we believe—questioned whether *Gupta* may no longer be good law in light of the Second Circuit's opinion in *Altman*.

### ii. Plaintiffs' claims are wholly collateral to the statute's review provisions.

The Complaint alleges that the SEC intentionally, irrationally, and illegally singled Plaintiffs out for unequal treatment in a bad faith attempt to deprive them of constitutional and other rights, based on animus—claims that are completely separate from the charges made against them in the OIP. *Cf.* Gupta, 796 F. Supp. 2d at 513 ("These allegations…would state a claim even if Gupta were entirely guilty of the charges made against him in the OIP.") Accordingly, the Complaint satisfies the second prong of *Free Enterprise*, in that the claims are "wholly collateral" to the applicable statutory review provisions.

### iii. Plaintiffs' claims are outside the Commission's expertise.

Plaintiffs' claims also satisfy the third prong of *Free Enterprise*, as they are not peculiarly within the Commission's competence or expertise. *See Free Enterprise*, 130 S. Ct. at 3151; *Gupta*, 796 F. Supp. 2d at 512. Indeed, "administrative expertise [is] not implicated where a constitutional violation is alleged, because such allegations are particularly suited to the expertise of the judiciary." *See Gupta*, 796 F. Supp. 2d. at 512 (quoting *Adkins v. Rumsfeld*, 389 F. Supp. 2d 579, 588 (D. Del. 2005)). The Commission, which will have to approve any final order against Plaintiffs, has already made it clear that it will never evaluate whether its disparate treatment of Plaintiffs was irrational or arbitrary. The Order Denying Petition confirms that that there will be no exploration within the AP of any question going to the merits of the Commission's decision to institute an AP against Plaintiffs without providing any of the procedural safeguards of federal court.

### III. Plaintiffs Will Be Irreparably Harmed If Injunctive Relief Is Not Granted

Plaintiffs' injury is "neither remote nor speculative," and "cannot be remedied by an award of monetary damages." *See Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (citing *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)). As

a result of the Commission's disparate treatment, the Plaintiffs are being denied a fair hearing for an improper purpose. Each day Plaintiffs are suffering irreparable harm. Additional irreparable harm can be prevented only by injunctive relief from this Court. An ongoing violation of due process or equal protection rights constitutes irreparable harm. *See Boyle v. County of Suffolk*, No. 10-CV-3606, 2010 WL 4340627, at *5-6, 2010 U.S. Dist. LEXIS 114487, at *15-16 (E.D.N.Y. Oct. 19, 2010).

## IV. The Balance Of The Hardships Tips Sharply In Plaintiffs' Favor And An Injunction Is In The Public Interest

Judge Rakoff has made clear that "there is no reason not to address the equal protection claim here before [plaintiff] suffers the very prosecution he alleges constitutes the act of unequal protection." 796 F. Supp. 2d. at 514. Plaintiffs will experience severe hardship, including violations of their equal protection rights and due process rights, if they are forced to proceed in the AP.

The Commission, by contrast, will suffer no hardship if a temporary restraining order and preliminary injunction are granted. Plaintiffs seek limited relief, relating solely to the specific circumstances of their case and do not seek to preclude the Commission from lawfully exercising its power to initiate administrative cease-and-desist proceedings. A preliminary injunction will not prevent the Commission from continuing to seek to hold Plaintiffs liable for purported violations of the securities laws in a manner that accords with Plaintiffs' rights to equal protection and due process.

In such circumstances, the balance of hardships tips sharply in Plaintiffs' favor, and the public interest is best served by this Court issuing an injunction.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court issue a preliminary injunction enjoining the Commission from continuing the AP during the pendency of the instant action, and restraining the Commission from proceeding with the administrative hearing which is currently scheduled for March 31, 2014.


Dated: New York, New York
       March 19, 2014

                                        Respectfully Submitted,

                                        HARDING ADVISORY LLC and
                                        WING F. CHAU

                                        By Their Attorneys,

                                        Alex Lipman
                                        Sean T. Haran
                                        David A. Feldman
                                        Ashley Baynham
                                        Nixon Peabody LLP
                                        437 Madison Avenue
                                        New York, NY 10022
                                        Tel: (212) 940-3128